UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

In re:                                          )
                                                )
**CATHERINE MARY SANDRIN,**        )      Case No. 14-21793-HRT
                                                )      Chapter 13
**Debtor.**                                )
_____)

# ORDER

This matter comes before the Court on Debtor's *Motion to Determine Secured Status Pursuant to 11 U.S.C. Section 506* (docket #33) (the "Valuation Motion"); *Creditor Patrick E. Thomas's Objection to the Debtor's Motion to Value Collateral* (docket #39) (the "Valuation Objection"); confirmation of Debtor's *Chapter 13 Plan Including Valuation of Collateral and Classification of Claims* dated January 22, 2015, (docket #51) (the "Plan"); and *Creditor Patrick E. Thomas's Objection to Confirmation of Debtor's Proposed First Amended Chapter 13 Plan* (docket #44) (the "Confirmation Objection").

## I. BACKGROUND INFORMATION

Catherine Mary Sandrin ("Debtor") owns property at 2375 S. Columbine Street, Denver, Colorado (the "Residence"). The Residence is a 1,076 square foot single unit home that is the subject of this dispute. Nationstar Mortgage, LLC, holds a first mortgage on the Residence perfected by a deed of trust filed on May 5, 1998. Nationstar's proof of claim indicates it is owed $176,405.20 as of the date of the filing of the petition. Beal Bank also holds a mortgage on the Residence that was recorded on July 18, 2001. Beal Bank's proof of claim indicates it is owed $112,147.40 as of the date of Debtor's bankruptcy petition. On September 29, 2005, the IRS recorded a tax lien on the Residence which reflected 2001 and 2003 tax liability of $15,157.49.

Finally, the Debtor, the Debtor's non-filing spouse, and a related company, Continental Divide Robotics, Inc. ("CDR"), executed a note, payable to Royal Firman III, dated October 26, 2001 (the "Note"). Under the terms of the Note, the Residence would serve as collateral but the Debtor and her husband were not personally obligated for repayment. The Note was subsequently assigned to Patrick E. Thomas ("Thomas"). Thomas's proof of claim lists a total claim of $541,550.76. He claims that $213,467.00 of that total is secured by his lien on the Residence.

In 2004 and 2005, prior to Thomas taking assignment of the Note, the Debtor and her husband filed an individual chapter 11 bankruptcy case and CDR, a business in which Mr.

1

Sandrin held a controlling interest, petitioned for chapter 11 relief.[1] In their individual chapter 11 plan, the Debtor and her husband acknowledged that Royal Firman III (Thomas's predecessor) held a secured claim. Under the terms of that plan, Firman retained his lien on the Residence; was to be paid only under the terms of CDR's confirmed plan; and had no recourse against the Debtor or her husband personally. Thomas claims that only one distribution of $966.46 was paid on the Firman claim under CDR's chapter 11 plan and it was never paid in full as the plan required.

Following assignment of the Firman Note and Deed of Trust to Thomas, he commenced foreclosure proceedings. The state court Rule 120 foreclosure hearing was scheduled for August 29, 2014, but Debtor filed a petition for chapter 13 relief on August 27, 2014.

On October 28, 2014, Debtor filed the Valuation Motion under 11 U.S.C. § 506 to determine the extent of Thomas's secured status. Debtor claims that, as of August 27, 2014, the value of the Residence was $359,000.00. Debtor also claims that Thomas's Deed of Trust is junior to the IRS lien and that, based on this value of the Residence, Thomas is wholly unsecured for purposes of his claim in this bankruptcy proceeding. Debtor further contends that Thomas is not entitled to payment as an unsecured creditor due to the nonrecourse nature of the Note.

In his Valuation Objection, Thomas contends that the Residence's actual value is $450,000.00 as of March 6, 2015. Thomas further objects on grounds that, even if he is wholly unsecured, he is entitled to an unsecured claim irrespective of Debtor's nonrecourse debt. Additionally, Thomas asserts that, if Debtor prevails on her Valuation Motion, she will no longer be eligible for chapter 13 relief and her petition must be dismissed because disallowance of Thomas's secured claim would result in an amount of unsecured debt that would exceed the eligibility limits stated in 11 U.S.C. § 109(e).

Debtors Plan was proposed on January 22, 2015. Thomas objects to confirmation on the grounds that the Plan does not comply with the provisions of chapter 13 and other applicable provisions of the Code as required by 11 U.S.C. § 1325(a)(1), is not feasible, and is not in the best interests of creditors. Thomas further alleges that neither the petition nor the Plan were filed in good faith as required by the Bankruptcy Code.

## II. DISCUSSION

A. Standing

As an initial matter, the Debtor has raised the issue of Thomas's standing to enforce the Note on the basis that Thomas transferred the Note to an affiliated company.

Creditors have standing to object to plan confirmation under 11 U.S.C. § 1325. *In re Brian Price Lewis*, 5 B.R. 575, 576 (Bankr. N.D. Ga. 1980). The Bankruptcy Code defines "creditor" as an entity with a pre-petition claim against the debtor. 11 U.S.C. § 101(10)(A).

---

[1] CDR, filed its petition on July 1, 2004 (04-24227-MER). Debtor and her husband petitioned for chapter 11 relief on October 12, 2005 (05-44645-MER).

2

"Claim" is defined as a "right to payment." 11 U.S.C. § 101(5)(A). To determine whether Thomas has a right to payment the Court turns to state law. *In re Miller*, 666 F.3d 1255, 1262-63 (10th Cir. 2012) (quoting *In re Mims,* 438 B.R. 52, 56 (Bankr.S.D.N.Y.2010)).

Under Colorado law, a note may be enforced by a holder who receives possession of an instrument through a negotiation. Colo. Rev. Stat. § 4-3-201(a). The requirement of possession prevents multiple "claimants from qualifying as holders who could take free of the other party's claim of ownership." *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1213 (Colo. 2008). A negotiation occurs when the instrument is transferred "to a person who thereby becomes its holder." Colo. Rev. Stat. § 4-3-201(a). Holder is defined to mean "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." Colo. Rev. Stat. § 4-1-201(b)(20)(A). If the instrument is payable to an identified person, the statute requires a transfer of possession and indorsement by the holder. Colo. Rev. Stat. § 4-3-201(b). Indorsement is defined as a signature that is "made on an instrument" for purposes of negotiation. Colo. Rev. Stat. § 4-3-204(a). The requirement that the signature be "made on" an instrument may be met by affixing a paper "to the instrument as part of the instrument." *Id.*

Royal Firman III, the original holder of the Note, affixed an allonge to the Note reflecting his indorsement to Thomas. Because the allonge was affixed to the Note, Firman's signature constitutes an indorsement for purposes of Colo. Rev. Stat. § 4-3-204(a). At the valuation hearing, Thomas testified that, after Firman indorsed the Note to him, he assigned it to a new venture, Thomas Financial Advisors, LLC, (the "LLC") that he formed with his son. On March 20, 2015, Thomas's counsel filed with the Court a copy of an assignment transferring the Note from the LLC to Thomas. The purported assignment was not affixed to the Note. Thomas's counsel also filed an affidavit affirming that the original Note and deed of trust are on file in his office.

There is no indorsement either on or affixed to the Note that serves as evidence of a negotiation of the Note from Thomas to the LLC or from the LLC back to Thomas. The purported assignments of the Note to the LLC and back did not constitute negotiations of the Note under Colorado law because the indorsements were not "made on" or "affixed to" the original Note as required by Colo. Rev. Stat. § 4-3-204(a).

As an alternative to negotiation, a note may be enforced by a transferee who receives delivery of the note for the purpose of giving the transferee the right to enforce it. Colo. Rev. Stat. § 4-3-203(a). When a note is transferred, the transferee is vested with "any right of the transferor to enforce the instrument." Colo. Rev. Stat. § 4-3-204(b). The Court accepts Thomas's oral testimony that he transferred possession of the Note to the LLC. The assignment document Thomas filed with the Court and, more importantly, the affidavit of Thomas's counsel that he is in possession of the original Note as Thomas's agent is evidence that Thomas is in constructive possession of the Note. *See In re Miller*, 666 F.3d 1255, 1264 n.9 (10th Cir. 2012) (recognizing theory of constructive possession); *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1213-14 (Colo. 2008) (same). The evidence before the Court, therefore, is that the Note was negotiated from Firman to Thomas and that Thomas is in constructive possession of the Note

In *Miller*, the note at issue was indorsed in blank. 666 F.3d at 1263. The court held that, under Colorado law, the party seeking to enforce the instrument was required to have possession of it. *Id.* at 1264 ("physical possession is essential because it constitutes proof of ownership and a

consequent right to payment"). That party, however, failed to prove that it had possession of the note. Instead, its counsel told the bankruptcy court that the note had been requested and would be in counsel's office "shortly." *Id.* at 1265. That assertion was insufficient to establish possession of the instrument for purposes of negotiation or transfer under the UCC. *Id.* at 1263-64.

Here, Thomas's counsel submitted a copy of an assignment from the LLC to Thomas and an affidavit affirming that the original Note is on file in counsel's office. Debtor's counsel has not responded to this submission. In the Court's view, Thomas has satisfied his burden of proving that he is the holder of the Note because the allonge affixed to the Note constitutes a negotiation of the Note to Thomas and he is in constructive possession of the Note.[2] The Court does not read *Miller* to require a different result considering the affidavit filed by Thomas's counsel and Debtor's failure to respond.

Finally, the fact that the Debtor bears no personal liability with respect to the Note does not affect Thomas's status as a creditor in this case because he has a mortgage claim against the Debtor's Residence. Under Colorado law, "[t]he transfer or assignment of a negotiable promissory note carries with it, as an incident, the deed of trust or mortgage upon real estate or chattels that secure its payment." *Columbus Investments v. Lewis*, 48 P.3d 1222, 1226 (Colo. 2002) (en banc). Thus, because the Court finds that Thomas is the holder of the Note and the Note carries with it the deed of trust on the Debtor's Residence, he is a party in interest by virtue of his claim against the Debtor's property. 11 U.S.C. § 102(2) ("'claim against the debtor' includes claim against property of the debtor"); *Johnson v. Home State Bank*, 501 U.S. 78, 86 (1991) ("Congress fully expected that an obligation enforceable only against a debtor's property would be a 'claim' under § 101(5) of the Code."). Thomas, therefore, has standing for purposes of this action.

## B. Priority

There is no dispute that Nationstar holds a first priority mortgage on the Residence. Neither is it disputed that Beal Bank's claim is anything other than second in priority. The issue, however, is where Thomas and the IRS rank in accordance with their respective claims. Under Colorado law, when two parties are secured in the same collateral, conflicting perfected security interests rank in accordance with the date of filing or perfection. Colo. Rev. Stat. § 4-9-322 (2001). *See also Denver Tec Bank v. F.D.I.C.*, 843 P.2d 129, 132 (Colo. App. 1992) (first to file rule applies, subject to certain exceptions not applicable here).

Debtor, Debtor's non-filing spouse, and CDR executed the Note secured by the Residence on October 26, 2001. Four years after execution, on September 16, 2005, Mr. Firman filed the Deed of Trust with the City and County of Denver. The filing date of September 16, 2005, controls for purposes of Thomas's priority. *See Carpenter v. Longan*, 83 U.S. 271, 274 (1872) ("[a]n assignment of the note carries the mortgage with it"). The IRS recorded its lien on the Residence on September 29, 2005. The IRS lien is therefore subordinate to Thomas's Deed of Trust because the latter was first in time.

---

[2] The Court has disregarded the purported assignment of the Note to the LLC and back. The Court has no documentary evidence of an assignment from Thomas to the LLC. But, even if the Court had evidence of the complete chain of possession, that would show no more than that Thomas, as holder of the Note temporarily transferred it to the LLC. The face of the Note shows that it was negotiated to Thomas and he has proven his current possession of the Note. He is the holder entitled to enforce the Note.

4

C. Valuation

Under the Bankruptcy Code, an allowed secured claim is secured only to the extent of a creditor's interest in the collateral and is unsecured for the deficiency. 11 U.S.C. § 506(a)(1); *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 961 (1997) (§ 506(a)(1) "tells us that a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral"). The value of the Residence is less than the debts secured by the property.[3] If the value of the Residence is greater than the liens of Nationstar and Beal Bank, Thomas is at least partially secured and his junior lien cannot be stripped off. *In re Rozinski*, 487 B.R. 549, 552 (Bankr. D. Colo. 2013). Under § 506(a)(1), value is to "be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditors interest." 11 U.S.C. § 506(a)(1). However, congressional intent embodies "a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012). Indeed, it is "not an exact science." *In re Coates*, 180 B.R. 110, 112 (Bankr. D.S.C. 1995). The purpose of the Valuation Motion is to determine the extent of Thomas's secured status. Debtor intends to retain the property as the family residence.

  1. *Burden of Proof*

The Bankruptcy Code does not specify the burden of proof for valuation proceedings. 4 Collier on Bankruptcy 506.03[9] at 506–88 (16th ed. rev.) ("The relevant burden of proof may change, depending on the circumstances."). For purposes of this proceeding, the Court will apply the shifting burden of proof as articulated by the Third Circuit Court of Appeals. The shifting burden of proof places the initial burden on the party "seeking to negate the presumptively valid amount of a secured claim." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012). *See also* 11 U.S.C. § 502(a) and Fed. R. Bank. P. 3001(f) (properly filed proofs of claim are prima facie evidence of validity). Thereafter, the burden shifts to the holder of the secured claim "'to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.'" *Id.* (quoting *In re Robertson,* 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)). *See also In re Rozinski*, 487 B.R. 549, 553-55 (Bankr. D. Colo. 2013).

  2. *The Residence*

The Residence is a 1,076 square foot single unit home built in 1927 with two bedrooms, one bathroom, and a single car garage. Debtor testified that she and her husband purchased the Residence in June of 1993. Debtor further testified that the home needs new tile and a new roof. The home does not have new amenities, its foundation shows cracks from settling, and the walls are likewise cracking. Debtor did testify that there has been some remodeling of the home, including new paint and other updates to the kitchen and the bathroom. While some of these updates occurred approximately two to three years ago, a majority occurred ten years ago.

---

[3] According to the proofs of claim filed in this case, the debt secured by the Residence (Nationstar, $176,405.20; Beal Bank, $112,147.40; Thomas, $541,550.76; and IRS, $15,157.49 (as reflected on its lien statement)) total in excess of $845,000.00.

*3. The Appraisals*

Debtor offers an appraisal by Mr. Lee Holmes, a certified appraiser, in support of her contention that the home was worth $359,000.00 on August 27, 2014. Mr. Holmes reached this amount by appraising the home based on its proposed "value and use." Thomas offers an appraisal by Mr. James Garner, a certified residential appraiser, in support of his contention that the home was worth $450,000.00 on March 6, 2015. Mr. Garner reached this amount based on a fair market value analysis.

Debtor has no intention of selling the home or "scraping" it in order to build a newer home on the property. Mr. Holmes testified that the "value and use" approach was appropriate because it is consistent with Debtor's proposed use of the property. In so concluding, Mr. Holmes looked to the value of comparable homes north of Evans Avenue, but disregarded homes located south of Evans, notwithstanding the proximity of such locations to the Residence. It appears that homes located south of Evans are more likely to be "scraped" and, as that use is inconsistent with Debtor's proposed use of the property, Mr. Holmes elected not to use such comparables in his analysis. In contrast, Mr. Garner reached the proposed value of $450,000.00 based on a fair market analysis, including scrutiny of home sales both north and south of Evans.

The Supreme Court has adopted the replacement value standard for purposes of valuation because it "accurately gauges the debtor's 'use' of the property" within the meaning of § 506(a). *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 963 (1997). While the Supreme Court did not define replacement value, *Rash* likely supports the position that replacement value means the price Debtor would pay to purchase the home in the current market. There is support for this position. In *In re Taffi*, the court held that "[v]aluation must be accomplished within the actual situation presented." 96 F.3d 1190, 1192 (9th Cir. 1996). When the debtor intends to retain the property, the foreclosure value is irrelevant and fair market value should be used. *Id. See Rash*, 520 U.S. at 963 (debtor's actual use of the property, "rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use'" under § 506(a)). *See also In re Serda*, 395 B.R. 450, 453 (Bankr. E.D. Cal. 2008) (applying fair market value because the debtor intended to retain the property); *In re Alvis*, No. 10-B-17861, 2011 WL 1348219, at *2 (Bankr. N.D. Ill. Apr. 7, 2011) (applying fair market value to § 506(a) based on the *Rash* holding); *In re Yildiz*, No. 11-11246-BFK, 2011 WL 6330169, at *3 (Bankr. E.D. Va. Dec. 19, 2011) ("Where the Debtor intends to retain, and not sell, the property, the appropriate method to determine the fair market value is the comparable sales method."); *In re Clay*, No. 10-69362-WSD, 2011 WL 5922428, at *1 (Bankr. E.D. Mich. Nov. 21, 2011) (interpreting *Rash* to require application of "retail" or "fair market value").

In his appraisal, Mr. Holmes disregarded the homes south of Evans as inconsistent with Debtor's proposed use of the Residence because such homes are more likely to be "scraped" than those north of Evans. The appropriate standard, however, is fair market value. Excluding a portion of the market, i.e., buyers who may seek to purchase the Residence to "scrape it off" and build a new structure, is an unreasonable restriction or limitation on fair market value. Mr. Garner's appraisal, therefore, is more in line with the applicable valuation standards because it more accurately gauges the fair market value of the Residence and does not discriminate against any class of potential buyers. This Court finds, for purposes of Thomas's secured claim, the Residence is valued at $450,000.00. After deducting the value of the two prior liens (Nationstar:

$176,405.20; Beal Bank: $112,147.40) from the Court's $450,000.00 valuation, the Court values Thomas's secured claim at $161,447.40.

D. Eligibility

To be eligible for chapter 13 relief, Debtor must owe noncontingent, liquidated, unsecured debts of less than $383,175.00 and noncontingent, liquidated, secured debts of less than $1,149,525.00. 11 U.S.C. § 109(e). In determining eligibility under section § 109(e), this Court looks to the Debtor's schedules, filed proofs of claim, "and other limited evidence bearing directly upon the good faith and reliability of the schedules and proofs of claim." *In re Salazar*, 348 B.R. 559, 563 (Bankr. D. Colo. 2006).

Debtor's schedules list Thomas as secured for $175,000.00 with no corresponding unsecured claim. Thomas's proof of claim, however, indicates he is owed $541,550.76. Under § 506(a), allowed claims are secured up to the value of the creditor's interest in the collateral and unsecured for the deficiency. Based on the valuation discussion above, Thomas holds a secured claim in the amount of $161,447.40. The remainder of the debt owed to Thomas on the Note − $380,103.76 – is an unsecured debt but it is an unsecured debt of CDR, not of the Debtor. Thomas argues that the unsecured portion of his debt should be treated as an unsecured claim in the Debtor's bankruptcy case notwithstanding that the Debtor has never been personally liable for repayment of the debt.

   *1. Johnson v. Home State Bank*

The Supreme Court case of *Johnson v. Home State Bank*, 501 U.S. 78 (1991) is relevant to this discussion. *Johnson* was not a case where the Supreme Court directly addressed issues with respect to § 109(e) eligibility. It addressed the broader question of whether an obligation with the characteristics of a nonrecourse mortgage could be included in a chapter 13 debtor's reorganization plan. The debtor's personal liability on his mortgage debt had been discharged in a prior chapter 7 case. In the debtor's subsequent chapter 13 case, he listed the bank's surviving mortgage interest in the real estate on his schedules and he sought to treat that lien as a claim that could be provided for in his chapter 13 plan. The Supreme Court observed that "[i]nsofar as the mortgage interest that passes through a Chapter 7 liquidation is enforceable only against the debtor's property, this interest has the same properties as a nonrecourse loan." *Id.* at 86. Because the obligation upon which Thomas's mortgage is based is a nonrecourse loan as to the Debtor, the facts in *Johnson* are analogous to the instant case.

In *Johnson*, the nature of the bank's surviving mortgage interest had been determined by the state court after the bankruptcy court granted relief from stay in the chapter 7 case and the bank reinstated its state court foreclosure proceeding. The state court ultimately granted the bank an *in rem* judgment against the real property in the amount of approximately $200,000.00. In the related case of *Home State Bank v. Johnson*, 729 P.2d 1225 (Kan. 1986), the Kansas Supreme Court explained the significance of the *in rem* judgment:

> [t]he Bank was specifically prohibited by the order of the Bankruptcy Court from taking any personal or excess judgment against the Johnsons. The Bankruptcy

> Court's order, however, does not preclude the state court from determining the *amount of the judgment which is chargeable against the land.*

*Id*. at 1231 (emphasis added).

Shortly after the *in rem* judgment against the real property was entered and a sheriff's sale was scheduled, the debtor filed his chapter 13 case. *In re Johnson*, 96 B.R. 362, 327 (D. Kan. 1989). In the debtor's chapter 13 case, the bank argued "that the Code does not allow a debtor to include in a Chapter 13 plan a mortgage used to secure an obligation for which personal liability has been discharged in Chapter 7 proceedings." *Johnson*, 501 U.S. at 79. The sole issue before the Supreme Court was whether or not the bank had a claim against the debtor that could be provided for in the debtor's chapter 13 plan. The Supreme Court held that "a mortgage lien in a Chapter 13 bankruptcy reorganization plan once the personal obligation secured by the mortgaged property has been discharged in a Chapter 7 proceeding . . . remains a 'claim' against the debtor that can be rescheduled under Chapter 13." *Id*. at 80.

The Supreme Court reasoned as follows: First, § 101(12) defines debt as "liability on a claim" and is "coextensive" with the meaning of "claim" as defined by § 101(5). *Id.* at 84 n.5 (citing *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557-58 (1990)). The term "claim" means a "right to payment" or a "right to an equitable remedy," 11 U.S.C. § 101(5), and the Court held that Congress intended for "claim" to be construed broadly. *Johnson*, 501 U.S. at 88.

Second, Section 502(b)(1) requires bankruptcy courts to determine the amount of a claim and allow the claim in such amount "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such a claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The Supreme Court in *Johnson* held that "the court must allow the claim if it is enforceable against *either* the debtor *or* his property." *Johnson*, 501 U.S. at 85. Furthermore, § 102(2), as a rule of construction, states that "'claim against the debtor' includes claim against property of the debtor." 11 U.S.C. § 102(2).

Thus, under *Johnson* "a mortgage interest that survives the discharge of a debtor's personal liability is a 'claim' within the terms of § 101(5)." *Johnson*, 501 U.S. at 84.

> Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor.

*Id.* at 78-79.

8

Just as in the instant case, the bank in *Johnson* held a mortgage lien against the debtor's real property but could assert no claim for personal liability against the debtor. But, the *Johnson* holding that a lien interest in a debtor's property, without any accompanying personal liability, may be asserted as a claim in a chapter 13 bankruptcy proceeding gives no guidance as to proper valuation of the allowed claim either for purposes of 11 U.S.C. § 109(e) eligibility or for purposes of distribution under a chapter 13 plan. Nowhere in *Johnson* does the Supreme Court quantify the amount of the bank's claim beyond noting that the state court had entered an *in rem* judgment against the debtor's real estate. *Johnson*, 501 U.S. at 80.

*2. Thomas's Claim*

The Bankruptcy Code instructs, in relevant part, that

> the court . . . shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

Thomas holds a lien against the Debtor's Residence. Under Colorado law, Thomas is entitled to foreclose his lien; cause the Residence to be sold at auction; and collect the sale proceeds after prior liens have been satisfied. The debt to Thomas is owed by CDR; the Debtor bears no personal liability. As a consequence, Thomas's rights with respect to the Debtor are limited to his recourse against the Residence and his claim "is unenforceable against the debtor and property of the debtor" to any extent over and above the value of his lien. The Court has calculated the value of Thomas's lien to be $161,447.40 based upon the $450,000.00 value of the Residence less the total of the prior liens. That is the total amount of Thomas's claim allowable under § 502(b)(1). Thomas's allowed claim is fully secured. 11 U.S.C. § 506 ("An allowed claim . . . secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.").

Thomas argues that the full amount of the debt owed to Thomas by CDR, and secured by the Residence, is the amount of Thomas's allowed claim. Under that analysis, based on the Court's valuation of the Debtor's Residence, Thomas would have a secured claim in the amount of $161,447.40 and an unsecured claim of $380,103.36 ($541,550.76 - $161,447.40). But allowance of that amount is unsupported by § 502(b) because no portion of the CDR debt is enforceable against the Debtor or the Debtor's property beyond what may be recovered from liquidation of the Residence after satisfaction of prior liens.

Moreover, under nonbankruptcy law the Debtor's general unsecured creditors have the right to obtain personal judgments against the Debtor. Such creditor may then obtain a judgment lien and subject the judgment debtor's non-exempt property to execution and sale to satisfy that

9

judgment lien. As the holder of a debt that is nonrecourse as to the Debtor, Thomas's lien attaches only to the Residence. For the Court to ignore the nonrecourse nature of Thomas's claim would create a large unsecured claim and entitle him to share the distribution to unsecured creditors. That would work to the prejudice of those unsecured creditors who do enjoy personal recourse against the Debtor under nonbankruptcy law. By the logic of Thomas's argument, he should enjoy recourse to his collateral as he does under nonbankruptcy law and, in addition, he should obtain the bankruptcy equivalent of a full recourse creditor's access to unencumbered non-exempt assets. That is a right he does not enjoy under nonbankruptcy law and that new right would come at the cost of diluting the rights of full recourse general unsecured creditors. The Court finds nothing in the Bankruptcy Code or in the *Johnson* discussion to support that remarkable result.

The Bankruptcy Code contains a provision that specifically orders distribution priorities among creditors. *See* 11 U.S.C. § 507. Otherwise, the Code looks to nonbankruptcy law to determine the basic rights of creditors. The Supreme Court has said

> Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. The "basic federal rule" in bankruptcy is that state law governs the substance of claims, Congress having "generally left the determination of property rights in the assets of a bankrupt's estate to state law." "Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

*Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000) (citations omitted). *See also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161(1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.").

Where Congress wishes to grant recourse rights to a nonrecourse creditor, it has done so with clarity. In 11 U.S.C. § 1111(b), the Code specifically provides that, with certain exceptions, in a case under chapter 11, "[a] claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . ." 11 U.S.C. § 1111(b)(1)(A). That provision confirms that Congress did not contemplate that a nonrecourse obligation would be allowed under § 502 the same as if it were a recourse obligation. Otherwise, § 1111(b) would be superfluous. There is no analogous chapter 13 provision that allows courts to reorder the rights of a nonrecourse creditor *vis a vis* a debtor's recourse creditors. When it intended to do so, Congress was fully capable of writing a provision that served to allow a nonrecourse claim as if the nonrecourse creditor enjoyed rights of recourse against the debtor. There is no such provision applicable to the instant case.

Thomas cites extensively to *In re Victorio*, 454 B.R. 759 (Bankr. S.D. Cal. 2011) to support his argument that he should be allowed an unsecured claim in the Debtor's case for the

10

difference between the amount owed by CDR and his secured claim. *Victorio* like *Johnson* is a "chapter 20" case where the debtor originally had personal liability on the secured debt but that personal liability was subsequently discharged in a prior chapter 7 case. The case came before the court for a hearing on confirmation of the debtors' proposed plan. They proposed to strip off a junior lien where the value of the debtors' residence was insufficient to fully secure the senior lien and provide any security for the debt to the junior lienholder. The debtors were ineligible for discharge because they filed their new chapter 13 case within four years of the prior chapter 7 case and the *Victorio* court's primary focus was on whether the debtors could permanently strip off the unsecured junior lien through completion of a chapter 13 plan without a discharge. The Court concluded that they could not.

In 23 pages of discussion, the *Victorio* court devotes about one and one-half paragraphs to the question of whether the junior lien creditor, whose *in personam* claim against the debtor was discharged in the chapter 7 case, was entitled to assert an unsecured claim in the chapter 13 case. *Id*. at 781. The court allowed the mortgage creditor an unsecured claim in the full amount of the debt it was owed and it cited to *Johnson* and to 11 U.S.C. § 102 as authority. *Id*.

Apart from citing to *Johnson* and to § 102, the *Victorio* court does not explain how either authority supports its conclusion that the nonrecourse creditor was entitled to an unsecured claim in the debtors' bankruptcy case. This Court does not find such support in either source. To say that a nonrecourse lien creditor has a claim in a bankruptcy case, under the Bankruptcy Code's broad definition of a "claim," falls short of characterizing or quantifying the claim. It does not follow that bankruptcy transforms the nonrecourse creditor's rights so that such a creditor is entitled to have its claim allowed as if it had personal recourse against the debtor. That result would be impossible to harmonize: 1) with the general principle that, absent a provision of the Bankruptcy Code to the contrary, substantive rights of creditors are determined by nonbankruptcy law; 2) with the provisions of 11 U.S.C. §502(b)(1) that require disallowance of a claim to the extent it is unenforceable against the debtor or the debtor's property; and 3) with the absence of any provision in chapter 13, similar to 11 U.S.C. § 1111(b), that provides for allowance of a nonrecourse claim as if the creditor had recourse. For those reasons, the Court finds *Victorio* unpersuasive on this point despite the fact that a number of other courts agree with *Victorio* that a debtor may be required to treat a debt that is no longer secured because of insufficient collateral value as an unsecured claim in a chapter 13 plan notwithstanding the creditor's inability to assert personal liability against the debtor. *See, e.g. In re Okosisi,* 451 B.R. 90, 96 (Bankr. D. Nev. 2011) ("Once the lien is . . . avoided, the unsecured claim that is represented by this nonrecourse debt becomes an unsecured claim in the bankruptcy case.") (citing *In re Hill*, 440 B.R. 176, 183 (Bankr. S.D. Cal. 2010)); *In re Akram*, 259 B.R. 371, 378-79 (Bankr. C.D. Cal. 2001) ("Section 524 does not support Debtors' request that these unsecured claims be valued at zero for chapter 13 plan purposes, due to the prior chapter 7 discharge.").

Other courts, however, share this Court's contrary view that a creditor who lacks recourse against a debtor personally has no basis to assert an unsecured claim in a chapter 13 bankruptcy proceeding. *See, e.g. In re Rosa*, 521 B.R. 337, 340-42 (Bankr. N.D. Cal. 2014) (creditor had neither secured nor unsecured claim where value of collateral insufficient to support secured claim and debtor's personal liability was discharged in prior chapter 7 case); *In re Sweitzer*, 476 B.R. 468, 471 (Bankr. D. Md. 2012) (same). After having examined both sides of the argument,

11

the Court is persuaded by the latter. Accordingly, the Court finds that Thomas holds a secured claim in this bankruptcy case in the amount of $161,447.40 because that is the amount supported by value in his collateral. Further, the Court finds that Thomas is entitled to assert no unsecured claim in this case because his Note is a nonrecourse obligation.

### 3. Application of § 1322(b)(2) to an Eligibility Determination under 11 U.S.C. § 109(e)

Some courts hold that the antimodification provision in 11 U.S.C. § 1322(b)(2) requires the inclusion of the full amount of an undersecured creditor's claim as a secured claim for § 109(e) chapter 13 eligibility purposes. *See, e.g., In re Munoz*, 428 B.R. 516, 519 (Bankr. S.D. Cal. 2010); *In re Smith*, 419 B.R. 826, 832 (Bankr. C.D. Cal. 2009). The Court disagrees.

The antimodification provision is applicable to claims "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). It is contained in § 1322, which prescribes the contents of a chapter 13 plan and, by prohibiting a chapter 13 plan to modify such claims, it carves out a special exception to the general rule that an undersecured claim may be modified in a chapter 13 plan by bifurcating the claim, under § 506(a), into secured and unsecured portions. But the Court finds nothing in the language of § 109(e) that references the provisions of § 1322 or otherwise justifies the importation of a special purpose provision, applicable specifically to chapter 13 plan contents, into the provision that sets out the eligibility requirements to file a case under chapter 13. Section 506(a) has the effect of bifurcating an undersecured claim into both secured and unsecured portions depending on the value of the collateral. In that respect it reflects an undersecured creditor's position under nonbankruptcy law. Importing § 1322(b)(2) into the § 109(e) eligibility analysis, results in recognizing the undersecured creditor's claim as secured to the full amount of the debt. That treatment ignores the generally applicable provisions of § 506(a) that bifurcate a creditor's claim and distorts the reality that a creditor's secured claim can only be as great as the value of the underlying collateral. The Court declines to follow that path with no express direction from the Code itself. With respect to the contents of a chapter 13 plan, that express guidance is present in § 1322(b)(2) but it is lacking in § 109(e).

In *Nobelman v. American Savings Bank*, the Supreme Court analyzed the interplay of §§ 1322(b)(2) and 506(a). The Court held that the antimodification provision found in § 1322(b)(2) refers to the secured creditor's applicable rights under state law. 508 U.S. 324, 339 (1993). Notwithstanding § 506, the debtors "could not modify the payment and interest terms for the unsecured component [of the creditor's claim] . . . without also modifying the terms of the secured component" in violation of § 1322(b)(2). *Id.* at 331-32.

Courts are split as to whether the *Nobelman* holding applies to the confirmation analysis alone or whether it can be used for purposes of eligibility as well. In *In re Blackwell*, the court held that the entire amount of an undersecured debt that was secured solely by the debtors' principle residence was to be treated as secured for purposes of eligibility because of the operation of § 1322(b)(2). 514 B.R. 19, 27 (Bankr. N.D. Ca. 2014). *Blackwell* reached this conclusion, in part, because of the notion that eligibility is to be determined by looking solely at the debtor's schedules. *Id.*

Certainly this Court starts its eligibility analysis by reviewing a debtor's schedules. However, the Court will also consider filed proofs of claim and other evidence. *In re Salazar*, 348 B.R. 559, 563 (Bankr. D. Colo. 2006). Where, as is the case here, the eligibility issue is not raised early in the case but is raised as an objection to plan confirmation, the Court will not ignore the valuation evidence produced at hearing in favor of a simple review of the schedules.

Other courts follow reasoning similar to that of *Blackwell*. These courts argue that consistency mandates the application of section 1322(b)(2) to the eligibility analysis. *See In re Munoz*, 428 B.R. 516, 519 (Bankr. S.D. Cal. 2010) (holding that liens partially secured by the debtor's principle residence should be treated as secured for both confirmation and eligibility because it is more consistent and more appropriate to treat debts the same for both purposes); *In re Smith*, 419 B.R. 826, 832 (Bankr. C.D. Cal. 2009) *aff'd in part,* 435 B.R. 637 (B.A.P. 9th Cir. 2010) ("It also would not be appropriate to split a claim for eligibility purposes if that claim must be treated as fully secured at confirmation."). While consistency is an appealing rationale, the Court finds it insufficient where §§ 109(e) and 1322(b)(2) serve entirely different functions and the language of neither provision provides support for using § 1322(b)(2) as part of the § 109(e) eligibility analysis.

The Court agrees with those courts that have determined that excluding the application of § 1322(b) from the eligibility analysis is more in line with congressional intent. *See, e.g., In re Brammer*, 431 B.R. 522, 524-25 (Bankr. D.D.C. 2009). *See also In re Werts*, 410 B.R. 677, 686 (Bankr. D. Kan. 2009) (declining "to graft additional content onto § 109(e) that Congress did not choose to include").

By declining to treat the undersecured portion of Thomas's nonrecourse claim as a secured debt for § 109(e) purposes, the Court's treatment of the Thomas claim reflects his position under nonbankruptcy law. Limiting the value of his secured claim to the value of the collateral securing it is consistent with Thomas's nonbankruptcy right of recourse solely against the collateral. The fact that the undersecured portion of his claim is disregarded in allowance of his claim under 11 U.S.C. § 502 and for § 109(e) eligibility purposes is consistent with the nonrecourse character of his claim under nonbankruptcy law. More importantly, the Court's treatment of Thomas's claim is compelled by the plain language of the applicable sections of the Bankruptcy Code.

*4. Legislative History*

Finally, the Bankruptcy Code's legislative history provides support for the Court's view that treatment of nonrecourse debts in bankruptcy should reflect their status under nonbankruptcy law absent a contrary provision in the Code itself. For example, in its discussion of the new § 506(a), the House Report says that

> The bill requires the court to value the secured creditor's interest. To the extent of the value of the security interest, he is treated as having a secured claim, entitled to be paid in full under the plan, unless, of course, he accepts less than full payment. To the extent that his claim against the debtor exceeds the value of his collateral, he is treated as having an unsecured claim, and he will receive payment along with all other general unsecured creditors. *Of course, the holder of a*

13

> *nonrecourse loan will not have an unsecured claim for the deficiency.* This is an important departure from a few misguided decisions under current law, under which a secured creditor with a $200[0 claim] secured by household goods worth only $200 is entitled in some cases to his full $2000 claim, in preference to all unsecured creditors.

H.R. Rep. 95-595, 124, 1978 U.S.C.C.A.N. 5963, 6085 (emphasis added). In its discussion of § 102, it says

> Paragraph (2) [of 11 U.S.C. § 102] specifies that 'claim against the debtor' includes claim against property of the debtor. This paragraph is intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally. Thus, such an agreement would give rise to a claim that would be treated as a claim against the debtor personally, for the purposes of the bankruptcy code. *However, it would not entitle the holders of the claim to distribution other than from the property in which the holder had an interest.*

H.R. Rep. 95-595, 315, 1978 U.S.C.C.A.N. 5963, 6272 (emphasis added). Finally, in its discussion of claim allowance under § 502, it says

> The house amendment contains a provision in section 502(b)(1) that requires disallowance of a claim to the extent that such claim is unenforceable against the debtor and unenforceable against property of the debtor. *This is intended to result in the disallowance of any claim for deficiency by an unsecured creditor on a nonrecourse loan or under a state antideficiency law, special provision for which is made in section 1111, since neither the debtor personally, nor the property of the debtor is liable for such a deficiency.* Similarly claims for usurious interest or which could be barred by an agreement between the creditor and the debtor would be disallowed.

H.R. Rep. 95-595, 549, 1978 U.S.C.C.A.N. 5963, 6448 (emphasis added).

    The report, in several places, discusses the treatment of nonrecourse debts generally and, in all cases, it is clear that the congressional intent was, in the absence of a special provision such as § 1111, that treatment of nonrecourse obligations under the Bankruptcy Code should mirror nonbankruptcy law. The holder of an undersecured nonrecourse obligation is allowed no claim for the deficiency amount. That is what the Court does here by recognizing that Thomas is a secured creditor in this case; that his claim is secured only to the extent that it is supported by value in the collateral; and that, as a nonrecourse creditor, his claim includes no unsecured component that may be asserted in this case either for purposes of distribution or eligibility.

*5. Application of 11 U.S.C. § 109(e)*

Section 109(e) provides that a an individual is ineligible for chapter 13 relief if his unsecured debts equal or exceed $383,175.00 or his secured debts equal or exceed $1,149,525.00. 11 U.S.C. § 109(e). Based upon the Court's review of the Debtor's schedules; the proofs of claim filed in this case; and the Court's valuation of the Debtor's Residence, the Court finds that the Debtor owed noncontingent, liquidated, secured debts on the petition date in the total amount of $450,000.00 and that the Debtor owed noncontingent, liquidated, unsecured debts on the petition date in the amount of $109,051.69. Those figures do not equal or exceed the limits stated in § 109(e) and, therefore, the Debtor is eligible for chapter 13 relief. [4]

E. Confirmation

Section 1325 sets forth a list of requirements that must be met prior to confirmation of a chapter 13 plan. *See* 11 U.S.C. § 1325(a); *In re Jones*, 530 F.3d 1284, 1290 (10th Cir. 2008). Thomas objects to confirmation on four grounds: the Plan (1) attempts to strip Thomas's lien, notwithstanding his status as partially secured, in violation of § 1325(a)(1); (2) is not feasible; (3) is not in the best interests of creditors; and (4) was not proposed in good faith (and neither was the petition). The Court finds that the Plan does not comply with the provisions of chapter 13 and other applicable provisions of the Bankruptcy Code in violation of § 1325(a)(1) and cannot be confirmed.

Thomas argues that the Plan improperly attempts to strip off his deed of trust, that he is entitled to an unsecured deficiency claim in the event his interest does not attach to the Residence as a result of Debtor's proposed valuation, and that if Debtor prevails, she is no longer eligible for relief under chapter 13. As previously discussed, the nonrecourse nature of Thomas's claim does not entitle him to an unsecured deficiency claim for purposes of Plan confirmation or Debtor's eligibility for chapter 13. The Court finds that Thomas holds a secured claim supported

---

[4] The Court's finding that the § 1322(b)(2) chapter 13 antimodification provision does not affect the § 109(e) eligibility determination does not mean the Debtor is not affected by that provision when it comes to proposing and confirming a chapter 13 reorganization plan. In the case of *Nobelman v. Am. Sav. Bank*, 508 U.S. 324 (1993), the Supreme Court rejected the debtors' position that § 1322(b)(2) only prohibited modification of the secured portion of the creditor's claim in the debtors' principal residence after the claim was bifurcated under § 506(a). The Court pointed out § 1322(b)(2) does not merely prohibit modification of the creditor's claim but that it prohibits modifying the creditor's "rights." *Id.* at 328-29. Among those rights, contained in the applicable mortgage documents in that case, the Supreme Court identified "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id.* at 329-330. The Supreme Court recognized that certain rights of a mortgage creditor are necessarily affected by a chapter 13 bankruptcy such as the creditor's right to foreclose without obtaining a lift of the automatic stay. *Id.* at 330. Nonetheless, assuming that § 1322(b)(2) is applicable to Thomas's claim, the need to preserve rights such as Thomas's right to retain his lien until his debt is fully paid may prove to be a significant obstacle to successful confirmation of a chapter 13 plan.

by the value of the Residence to the extent of $161,447.40. As a consequence, Thomas's lien cannot be stripped from the Residence and must be provided for by the Debtor's Plan.

Section 506(a) makes clear that a creditor is secured up to the value of the collateral and is unsecured for the deficiency. 11 U.S.C. § 506(a)(1). Thomas is secured in the amount of $161,447.40 but, because he is a nonrecourse creditor, he has no unsecured deficiency claim. Section 1325(a)(5) provides three alternative treatments for secured creditors under a chapter 13 plan. For a plan to be confirmed, secured creditors must accept the plan, retain their liens until the earlier of receipt of full payment or discharge, or receive the property by way of the debtor's surrender of such property to the creditor. 11 U.S.C. § 1325(a)(5). Here, Thomas has not accepted the Plan as is evidenced by his Confirmation Objection. Neither has the Debtor surrendered the Residence to Thomas. In fact, Debtor testified that she intends to keep the family home. Finally, the Plan does not provide that Thomas retain his lien until the earlier of his receipt of full payment or Debtor's discharge. Instead, Debtor's Plan makes no provision for Thomas's lien. Because the Court finds that Thomas is a secured creditor and the Debtor's Plan makes no provision for Thomas's secured claim, the Plan does not comply with § 1325(a)(1) or with § 1325(a)(5) and cannot be confirmed.

Thomas's objections based on the best interests of creditors and feasibility need not be addressed at this time. However the Court has considered and rejects Thomas's objection based on the Debtor's bad faith. The evidence persuades the Court that the Debtor has filed her case and proposed her Plan in good faith. The Debtor's treatment of Thomas's claim and her attempt to avoid his lien were consistent with her valuation of the Residence and consistent with the provisions of the Bankruptcy Code if the Court would have adopted that valuation. The fact that the Court has rejected the Debtor's proposed valuation and adopted Thomas's value renders her Plan unconfirmable as presently written but, without more, the evidence before the Court provides no basis for a finding of bad faith.

### III. CONCLUSION

In accordance with the above discussion, the Court finds the value of the Debtor's Residence is $450,000.00 and, after accounting for the prior liens, Thomas holds an allowed secured claim in this bankruptcy case in the amount of $161,447.40. Because Thomas is a nonrecourse creditor, he holds no allowed unsecured claim for any deficiency amount.

Debtor's Plan, as presently proposed cannot be confirmed because it fails to make provision for Thomas's secured claim. The Debtor will be allowed to propose an amended plan.

Therefore, it is

**ORDERED** that Debtor's *Motion to Determine Secured Status Pursuant to 11 U.S.C. Section 506* (docket #33) is DENIED. The Court hereby allows Thomas's Claim No. 3-1 in the secured amount of $161,447.40 and in the unsecured amount of $0.00. It is further

**ORDERED** that confirmation of Debtor's *Chapter 13 Plan Including Valuation of Collateral and Classification of Claims* dated January 22, 2015, (docket #51) is DENIED. Debtor may propose an amended chapter 13 plan within 21 days from entry of this order. Failure of the Debtor to propose an amended plan within 21 days will be grounds for dismissal of Debtor's case without further notice or proceedings.

Dated this 28th day of August, 2015.

**BY THE COURT:**

_____
Howard R. Tallman, Judge
United States Bankruptcy Court